## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

**ANGELITA O.,**

   **Plaintiff,**

**v.**

**KILOLO KIJAKAZI,** *Acting Commissioner, Social Security Administration,*[1]

   **Defendant.**

**CIVIL ACTION FILE**

**NO. 1:20-cv-00034-AJB**

## <u>ORDER AND OPINION</u>[2]

Plaintiff Angelita O. brought this action pursuant to §§ 205(g) and 1631(c) of the Social Security Act, 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of the final decision of the Commissioner of the Social Security Administration ("the Commissioner") denying her applications for disability

---

[1]   Kilolo Kijakazi is now the Acting Commissioner of the Social Security Administration.  Under the Federal Rules of Civil Procedure, Kijakazi "is automatically substituted as a party."  Fed. R. Civ. P. 25(d).  The Clerk is hereby **DIRECTED** to amend the case style to reflect the substitution.

[2]   The parties have consented to the exercise of jurisdiction by the undersigned pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure.  (*See* Dkt. Entry dated October 5, 2020).  Therefore, this Order constitutes a final Order of the Court.

insurance benefits ("DIB") and supplemental security income benefits ("SSI")

under the Social Security Act.[3]    For the reasons set forth below, the Court

**REVERSES** the final decision of the Commissioner and **REMANDS** the case to

the Commissioner for further proceedings consistent with this opinion.

## I.    <u>PROCEDURAL HISTORY</u>

Plaintiff filed applications for SSI and DBI on November 29, 2016, alleging

disability commencing on February 1, 2013.    [Record (hereinafter "R") 222-25].

Plaintiff's applications were denied initially and on reconsideration.    [R70-107,

110-47].    Plaintiff then requested a hearing before an Administrative Law Judge

---

[3]    Title XVI of the Social Security Act, 42 U.S.C. § 1381, *et seq.*, provides for supplemental security income for the disabled.    Title II of the Social Security Act provides for federal disability insurance benefits.    42 U.S.C. § 401, et seq.    Title XVI claims are not tied to the attainment of a particular period of insurance eligibility.    *Baxter v. Schweiker*, 538 F. Supp. 343, 350 (N.D. Ga. 1982). The relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income.    *Davis v. Heckler*, 759 F.2d 432, 435 n. 1 (5th Cir. 1985).    Title 42 U.S.C. § 1383(c)(3) renders the judicial provisions of 42 U.S.C. § 405(g) fully applicable to claims for SSI.    In general, the legal standards to be applied are the same regardless of whether a claimant seeks DIB, to establish a "Period of Disability," or to recover SSI. However, different statutes and regulations apply to each type of claim.    Many times, parallel statutes and regulations exist for DIB and SSI claims. Therefore, citations in this opinion should be considered to refer to the appropriate parallel provision as context dictates.    The same applies to citations of statutes or regulations found in quoted court decisions.

("ALJ"). [R172-74]. An evidentiary hearing was held on October 4, 2018. [R34-69]. The ALJ issued a decision on January 22, 2019, denying Plaintiff's application on the ground that she had not been under a "disability" at any time through the date of the decision. [R13-33]. Plaintiff sought review by the Appeals Council, and the Appeals Council denied Plaintiff's request for review on November 4, 2019, making the ALJ's decision the final decision of the Commissioner. [R1-6].

Plaintiff then filed an action in this Court on January 3, 2020, seeking review of the Commissioner's decision. [Doc. 1]. The answer and transcript were filed on September 2, 2020. [Docs. 17-18]. On October 5, 2020, Plaintiff filed a brief in support of her petition for review of the Commissioner's decision, [Doc. 22], on November 4, 2020, the Commissioner filed a response in support of the decision, [Doc. 23], and Plaintiff filed a reply brief on November 18, 2020, [Doc. 25]. On August 6, 2021, Plaintiff filed a Notice of Supplemental Authority and attached a Memorandum Opinion for the Deputy Counsel to the President on the Constitutionality of the Commissioner of Social Security's Tenure Protection. [*See* Docs. 29, 29-1]. The matter is now before the Court upon the administrative record, the parties' pleadings, and the parties' briefs, and it is accordingly ripe for review pursuant to 42 U.S.C. § 405(g).

3

## II.    PLAINTIFF'S CONTENTIONS

As set forth in Plaintiff's brief, the general issue to be decided is whether the decision of the Commissioner is supported by substantial evidence.  [Doc. 22 at 6]. Plaintiff identified the specific issues as whether an ALJ decision should be reversed where (1) the ALJ does not evaluate all impairments, including Plaintiff's impingement and a cyst in her right (dominant) shoulder that are relevant to her credibility and RFC, (2) the RFC fails to account for important evidence, including the cyst in Plaintiff's dominant right shoulder and with her limited ability to deal with authority figures, including supervisors, and (3) there is an unexplained conflict between vocational testimony and the DOT.  [*Id.* at 6].

## III.   STANDARD FOR DETERMINING DISABILITY

An individual is considered disabled for purposes of disability benefits if he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  The impairment or impairments must result from anatomical, psychological, or physiological abnormalities which are demonstrable by medically accepted clinical or laboratory diagnostic techniques and must be of such severity that the claimant is not only

4

unable to do previous work but cannot, considering age, education, and work experience, engage in any other kind of substantial gainful work that exists in the national economy.  42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

The burden of proof in a Social Security disability case is divided between the claimant and the Commissioner.  The claimant bears the primary burden of establishing the existence of a "disability" and therefore entitlement to disability benefits.  20 C.F.R. §§ 404.1512(a), 416.912(a).  The Commissioner uses a five-step sequential process to determine whether the claimant has met the burden of proving disability.  20 C.F.R. §§ 404.1520(a), 416.920(a); *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001); *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999), *superseded by* Social Security Ruling ("SSR") 00-4p, 2000 WL 1898704 (Dec. 4, 2000),[4] *on other grounds as stated in Washington*

_____

[4]   Social Security Rulings are published under the authority of the Commissioner of Social Security and are binding on all components of the administrative process.  *Sullivan v. Zebley*, 493 U.S. 521, 530 n.9 (1990), *superseded by statute on other grounds as stated in Colon v. Apfel*, 133 F. Supp. 2d 330, 338-39 (S.D.N.Y. 2001); *Tauber v. Barnhart*, 438 F. Supp. 2d 1366, 1377 n.6 (N.D. Ga. 2006) (Story, J.) (citing 20 C.F.R. § 402.35(b)(1)).  Although SSRs do not have the force of law, they are entitled to deference so long as they are consistent with the Social Security Act and regulations.  *Massachi v. Astrue*, 486 F.3d 1149, 1152 n.6 (9th Cir. 2007); *Salamalekis v. Comm'r of Soc. Sec.*, 221 F.3d 828, 832 (6th Cir. 2000) ("If a Social Security Ruling presents a reasonable construction of an ambiguous provision of the Act or the agency's regulations, we usually defer to the SSR."); *Minnesota v.*

*v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1360-61 (11th Cir. 2018).  The claimant

must prove at step one that he is not undertaking substantial gainful activity.

20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).  At step two, the claimant must

prove that he is suffering from a severe impairment or combination of impairments

that significantly limits his ability to perform basic work-related activities.

20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  At step three, if the impairment

meets one of the listed impairments in Appendix 1 to Subpart P of Part 404 (Listing

of Impairments), the claimant will be considered disabled without consideration of

age, education, and work experience.        20 C.F.R. §§ 404.1520(a)(4)(iii),

416.920(a)(4)(iii).  At step four, if the claimant is unable to prove the existence of

a listed impairment, he must prove that his impairment prevents performance of

past relevant work.    20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).    At

step five, the regulations direct the Commissioner to consider the claimant's

residual functional capacity, age, education, and past work experience to determine

whether the claimant can perform other work besides past relevant work.  20 C.F.R.

§§ 404.1520(a)(4)(v), 416.920(a)(4)(v).    The  Commissioner  must  produce

---

*Apfel*, 151 F.3d 742, 748 (8th Cir. 1998) ("Social Security Rulings, although entitled
to deference, are not binding or conclusive."); *Pass v. Chater*, 65 F.3d 1200, 1204
n.3 (4th Cir. 1995); *Gordon v. Shalala*, 55 F.3d 101, 105 (2d Cir. 1995); *Andrade v.
Sec'y of Health and Human Servs.*, 985 F.2d 1045, 1051 (10th Cir. 1993).

evidence that there is other work available in the national economy that the claimant has the capacity to perform. *Doughty*, 245 F.3d at 1278 n.2. To be considered disabled, the claimant must prove an inability to perform the jobs that the Commissioner lists. *Id.*

If at any step in the sequence a claimant can be found disabled or not disabled, the sequential evaluation ceases and further inquiry ends. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). Despite the shifting of burdens at step five, the overall burden rests on the claimant to prove that he is unable to engage in any substantial gainful activity that exists in the national economy. *Doughty*, 245 F.3d at 1278 n.2; *Boyd v. Heckler*, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds by* 42 U.S.C. § 423(d)(5), *as recognized in Elam v. R.R. Ret. Bd.*, 921 F.2d 1210, 1214 (11th Cir. 1991).

## VI.   <u>SCOPE OF JUDICIAL REVIEW</u>

A limited scope of judicial review applies to a denial of Social Security benefits by the Commissioner. Judicial review of the administrative decision addresses three questions: (1) whether the proper legal standards were applied; (2) whether there was substantial evidence to support the findings of fact; and (3) whether the findings of fact resolved the crucial issues. *Washington v. Astrue*, 558 F. Supp. 2d 1287, 1296 (N.D. Ga. 2008); *Fields v. Harris*, 498 F. Supp. 478,

488 (N.D. Ga. 1980).  This Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005).   If substantial evidence supports the Commissioner's factual findings and the Commissioner applies the proper legal standards, the Commissioner's findings are conclusive.  *Lewis v. Callahan*, 125 F.3d 1436, 1439-40 (11th Cir. 1997); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987) (per curiam); *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986) (per curiam); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

"Substantial evidence" means "more than a scintilla, but less than a preponderance." *Bloodsworth*, 703 F.2d at 1239.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, and it must be enough to justify a refusal to direct a verdict were the case before a jury. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Hillsman*, 804 F.2d at 1180; *Bloodsworth*, 703 F.2d at 1239.  "In determining whether substantial evidence exists, [the Court] must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [Commissioner's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986) (per curiam).  Even where there is

8

substantial evidence to the contrary of the ALJ's findings, the ALJ decision will not be overturned where "there is substantially supportive evidence" of the ALJ's decision. *Barron v. Sullivan*, 924 F.2d 227, 230 (11th Cir. 1991). In contrast, review of the ALJ's application of legal principles is plenary. *Foote v. Chater*, 67 F.3d 1553, 1558 (11th Cir. 1995); *Walker*, 826 F.2d at 999.

## VII.  STATEMENT OF FACTS[5]

### A.  Background

Plaintiff was a younger individual, who had an eleventh-grade education and training in the medical field, and had previously worked as manager and assistant manager at a restaurant. [R44, 222, 254]. Plaintiff alleges disability due to depression, anxiety, PTSD, chronic pain in the back and shoulders, impingement and a cyst in her right, dominant shoulder, arthritis in the right knee, plantar fasciitis, and chronic pain syndrome. [Doc. 22 at 6-7; R18-19].

### B.  Lay Testimony

Plaintiff was 37 ½ years old at the time of the hearing. [R37]. She was not

---

[5]    In general, the records referenced in this section are limited to those deemed by the parties to be relevant to this appeal. [*See* Docs. 22-23, 25; *see also* Doc. 20 (Sched. Ord.) at 3 ("The issues before the Court are limited to the issues properly raised in the briefs.")]. Where a party's numbering conflicts with the page numbers assigned by the Court's electronic filing system, the Court's citations will utilize the page numbering assigned by the Court's electronic filing system.

represented by an attorney.  [R37-38].  Plaintiff stated that she had no objections to the case file.  [R40].  The ALJ noted that Plaintiff had a prior case with the SSA that was decided on October 7, 2016 and that because of res judicata he could only consider whether or not she became disabled after that date.  [R41-42].  The ALJ informed Plaintiff that she was testifying under oath.  [R43].

Plaintiff testified that she finished eleventh grade and was currently going for her GED.  [R44].  She drove three times a week to church or the grocery store. [*Id.*].  She had three children and her youngest, who was 16, still lived with her. [R45].  She had not left Atlanta in the last two years.  [R46].  She did not really do chores—she would try to clean up but could not do it all the way.  [R47].  Her husband and child did most of the work but she tried to clean the bathroom and sometimes did the cooking.  [*Id.*].

On a normal day, Plaintiff got up, walked to the bathroom and brushed her teeth, walked around the house for a bit, then walked back to her room and watched television.  [R49].  She would fall asleep and, in the evenings, she sometimes drove to pick up her son.  [*Id.*].  She could sit for about 30 minutes while shifting her weight and could also stand for about 30 minutes.  [R50-51].  She could lift less than a gallon of water and could walk with a cane for about 15-20 minutes.  [R51].

10

Plaintiff stated that she could not work because her knees bothered her a lot and gave out when she stood up, but she had a total knee replacement and was getting better. [*Id.*]. She said that her back hurt badly and if she bent over it would give out on her. [*Id.*]. She also often had muscle spasms because of a disc that was pressing down on a nerve. [R51-52]. She had arthritis in her spine and scoliosis in her thoracic spine. [R52]. She had back pain every day and had an appointment to see pain management next year but was not taking medication or receiving injections. [*Id.*]. She took Aleve sometimes, but it did not work and neither did muscle relaxants. [R52-53]. She went to the emergency department a few weeks before the hearing because she could not sleep and every time she turned over it hurt. [R53]. Plaintiff's right and left knees were okay, but her right knee hurt her sometimes due to arthritis. [R53].

Plaintiff also suffered from depression, anxiety, and PTSD, which limited her ability to work because she was always thinking about the past and how she was beaten by her ex-husband and the father of her child. [R53-54]. Her godmother also passed away and she felt like it was too much to bear. [R54]. She did not want to be around anyone, got upset over little things, and had a bad attitude. [*Id.*]. She heard voices telling her to do things. [*Id.*].

Her daily activities included watching television.  [R54-55].  She did not have memory problems.  [R55].  Her depression and anxiety medications spaced her out and her diabetes medicine gave her diarrhea.  [R55-56].  She mostly brushed her teeth, went to the bathroom, and got dressed by herself, but her daughter did her hair because lifting her arms hurt her shoulders.  [R56].  In August of the year of the hearing Plaintiff went to Wellstar Hospital for chest pain while she was driving.  [R58-59].  She has been working part-time in a delivery job delivering auto parts two times a week.  [R59-60].  She worked seven hours a day for $12.50 an hour and drove her own minivan.  [R60].  The heaviest thing she delivered was as box of oil, which weighed about 15 pounds.  [R61-62].  The longest she drove at a time was 15 minutes and she spent about half the time sitting and half standing. [R62-63].  She usually had someone with her.  [R63].

Plaintiff also heard voices telling her to do things like go through red lights, which she had done once and which resulted in an accident where someone was hurt.  [R67].  She was taking medication but it was not helping her and she was seeing her doctor to have it switched.  [R67-68].

## C.   Medical Records

On April 21, 2016, an MRI arthrogram with contrast was performed on Plaintiff's right shoulder following her complaint of right shoulder pain and a

limited range of motion.  [R370].  Supraspinatus, infraspinatus, teres minor, and subscapularis tendons were intact with no advanced tendinosis or significant tear and there was normal rotator cuff muscle signal intensity and bulk.  [*Id.*].  No discrete or displaced labral tear was identifiable and the inferior glenohumeral ligament was intact.  [*Id.*].  The MRI disclosed no advanced AC joint arthrosis or subacromial-subdeltoid bursitis.  [*Id.*]. The impression was of lobulated ganglion or paralabral cyst at the posterior superior glenoid at level of spinoglenoid notch.[6] [*Id.*].

On May 10, 2016, Plaintiff was seen by Michael J. Morrison, M.D., complaining of right shoulder pain, 7/10 in severity, and reporting that injections only helped for 2-3 days and that she could not lay or sleep on her right shoulder. [R948].  Dr. Morrison noted that an MRI/arthrogram was performed on April 21,

---

[6]    The spinoglenoid notch is a connection between the infraspinatus fossa and the supraspinatus fossa, which are divided by the scapular spine.  The notch is formed lateral to the point which the spine extrudes from the scapula, with the spinoglenoid ligament (also known as the inferior transverse scapular ligament) forming a foramen by passing from the lateral aspect of the scapular spine to the posterior part of the glenoid.  The suprascapular nerve and artery passes through the notch on their course over the scapula.  A spinoglenoid notch cyst may occur from a posterior SLAP tear, and the cyst may cause mass effect on the suprascapular nerve, resulting in infraspinatus denervation (i.e. suprascapular neuropathy).  Dr. Paul Heyworth and Dr. Matt A. Morgan, *Spinoglenoid Notch*, https://radiopaedia.org/articles/spinoglenoid-notch?lang=us (last visited 09/12/2021).

2016 showing a labral cyst in the spinoglenoid notch. [*Id.*]. They discussed options, including surgery, and Plaintiff's medications were renewed and a follow-up appointment was scheduled for 3 weeks. [*Id.*].

On May 31, 2016, Plaintiff was seen by Dr. Morrison for left shoulder pain, 7 / 10 in severity that was constant. [R372]. Plaintiff had a limited range of motion and tenderness. [*Id.*]. An x-ray of the shoulder showed no fracture or dislocation and the impression as of impingement syndrome and depression. [*Id.*]. Plaintiff declined an injection, saying that a previous injection to her right shoulder did not help her pain and Dr. Morrison stated she should do pendulum exercises. [*Id.*].

On July 5, 2016, Plaintiff was seen by Dr. Morrison for right shoulder pain and a physical examination revealed marked tenderness over the subacromial space and positive impingement signs. [R946]. Dr. Morrison noted that an MRI showed signs of paralabral cysts at the spinoglenoid notch. [*Id.*]. They discussed options, including surgery, and Plaintiff's medications were renewed and Plaintiff was instructed to follow-up in four weeks. [*Id.*].

On October 27, 2016, Plaintiff was seen for a sore throat and plantar fasciitis. [R347]. She said her feet hurt when she first got out of bed and later in the evening and that acetaminophen provided no relief. [*Id.*]. A review of systems was negative for chills and fever, palpitations and leg swelling, back pain, myalgias,

14

and neck pain.  [*Id.*].   A physical exam indicated Plaintiff was well-developed and nourished, had a normal range of motion in her neck, her musculoskeletal exam revealed no edema, and she had a normal mood and affect and her judgment and thought content were normal.  [R348].

On November 21, 2016, Plaintiff was seen by Dr. Morrison complaining of constant right shoulder pain, 8 / 10 in severity, that was worse when doing her hair. [R942].  She was found to be alert and oriented but to have a limited range of motion with her shoulder and to grimace and withdraw when examined.  [*Id.*].  A cervical spine exam showed some right-sided neck tenderness and a neurovascular examination was grossly intact.  [R942-43].  The impression was of right shoulder pain with impingement with intact cuff that Dr. Morrison chose to treat conservatively by referring Plaintiff for physical therapy and renewing her medications.  [R943].

On December 20, 2016, Plaintiff was seen for a medication follow-up at MSJ Decatur Street PC after having been seen eight months prior.  [R912].  She complained of decreased energy and motivation and about having nightmares about death.  [*Id.*].  Her husband, who accompanied her, reported that Plaintiff was still hearing voices.  [*Id.*].  A mental status exam indicated that Plaintiff was cooperative, oriented, she denied suicidal or homicidal ideation, her thought process was logical

15

and goal directed, her memory was intact, her attention was normal, and her judgment and insight were fair. [R913]. The plan was to continue medications, practice stress management techniques, improve sleep hygiene, incorporate healthy lifestyle changes, and attend psychotherapy sessions. [R914].

On January 11, 2017, Plaintiff completed a Function Report indicating that her leg swelled from standing too long, her shoulder hurt when she lifted it over her head, her back hurt a lot, and she was thinking all kinds of crazy things. [R269]. Plaintiff stated she had nightmares, could not dress herself or care for her hair because of shoulder pain, needed reminders to take medicine, did not do any yard work, went outside daily and walked and rode in a car, shopped for food once a month, could pay bills and handle a savings account, watched television daily, and loved to go to church. [R269-73]. She claimed that her attitude had changed and she got upset quickly, that she was right handed, that she could walk five to seven minutes before needing to rest, and could pay attention for 20 to 30 minutes at a time. [R274]. She stated that she could follow spoken and written instructions okay but did not get along with authority figures and did not handle stress or changes to her routine well. [R274-75]. Plaintiff claimed that her medications caused drowsiness and blurred vision. [R276].

On the same day, Plaintiff's husband filled out a Third-Party Function

Report.  [R279].  In the report, he also indicated that Plaintiff did not get along with authority figures at all.  [R285].

On January 17, 2017, Dr. Morrison performed a follow-up examination for constant right shoulder pain that Plaintiff described as being 8 / 10 in severity. [R941].

On February 6, 2017, Plaintiff was seen at Wellstar Cobb Hospital for a wrist injury and stated someone dropped heavy rotors on her wrist.  [R967-68].  Plaintiff had not attempted any treatment for her symptoms.  [R967].  A review of systems was negative for chills and fever, negative for back pain, neck pain, and stiffness, negative or dizziness, tingling, weakness, numbness, and headaches, and negative for psychiatric and behavioral issues.  [R968].  Plaintiff was found to be oriented to person, place, and time and to be active and cooperative.  [R969].   The only musculoskeletal issue noted related to Plaintiff's right wrist and she was found to have no sensory deficit, normal muscle tone, normal coordination and gait, and to have a normal mood and affect.  [*Id.*].

On February 28, 2017, Plaintiff was seen by Dr. Morrison complaining of unrelieved and significant right shoulder pain described as being 7 / 10 in intensity. [R939].  He stated that an MRI was performed on April 21, 2016 showing para labral cyst at the posterior superior glenoid level at the level of the glenoid notch.

[*Id*.].  During a physical exam, Plaintiff was found to be alert and oriented, to have limited flexion in her right shoulder and to grimace and withdraw when examined, and had a normal cervical spine exam.  [R939-40].  Her neurovascular examination was grossly intact.   [R940].   The impression was of right shoulder pain with impingement and marked tenderness over the biceps tendon and a paralabral cyst over the spinoglenoid notch, which was consistent with her biceps and impingement symptoms.  [*Id.*].  Dr. Morrison noted that conservative therapy, including injections, had not been successful and options for treatment were discussed.  [*Id.*].

On March 21, 2017, B. Rudnick, M.D., performed a Mental Residual Functional Capacity Assessment.  [R84].  Dr. Rudnick concluded that Plaintiff had was not significantly limited in her abilities to remember locations and work-like procedures, to understand and remember very short and simple instructions, but that she was moderately limited in her ability to understand and remember detailed instructions, noting that she could understand and remember uncomplicated instructions.   [*Id.*].   Dr. Rudnick further found that Plaintiff had sustained concentration and persistence limitations and social interaction limitations, including that she was moderately limited in her ability to interact appropriately with the public and in accepting instructions and responding appropriately to

criticism from supervisors, but was not significantly limited in her ability to get along with coworkers.  [R84-85].  Dr. Rudnick further found that Plaintiff was moderately limited in her ability to respond to changes in work settings, but not significantly limited in her ability to be aware of normal hazards, use public transportation, or set realistic goals.  [R85-86].  James Mullins, Ph.D., later made similar findings on August 1, 2017.  [R124-26].

On April 4, 2017, Plaintiff was seen by Dr. Morrison for right shoulder pain that was constant and unrelieved and 9/10 in intensity.  [R937].  Dr. Morrison noted that an MRI was performed on 4/21/16 that showed a para labral cyst at the posterior superior glenoid level at the level of the glenoid notch.  [*Id.*].  A physical examination showed that Plaintiff was alert and oriented but had a limited range of right shoulder motion with tenderness over the greater tuberosity.  [R937-38].  Plaintiff's rotator cuff strength was 4/5 and her cervical spine exam was okay.  [R938].  Dr. Morrison administered an injection over the proximal biceps tendon of the right shoulder with 1cc of 1% lidocaine and 4 mg of dexamethasone.  [*Id.*].  Dr. Morrison advised Plaintiff to do shoulder pendulum exercises, scapular strengthening exercises, and to avoid impingement type activities.  [*Id.*].

On April 18, 2017, Plaintiff was seen by Cathy Harper-Hogan, M.D., for a Consultative Examination while re-applying for disability.  [R925].  Plaintiff

19

indicated she was independent in feeding and grooming, bathing, upper and lower body dressing, and transfers, but did need a cane.  [R927].  She stated that she had problems putting on her bra, driving, and could not stand to wash dishes or cook. [*Id.*].  A review of systems indicated that Plaintiff had trouble sleeping, had no chest pain, had chronic bilateral knee pain and shoulder pain, and had a history of depression and anxiety.  [R928].

A physical exam revealed that Plaintiff was well-developed and not in acute distress, her heart had a regular rate and rhythm, her spine was non-scoliotic, she had a full range of motion of the cervical and lumbar spine with slight tenderness to palpitation, and her gross manipulative skills were within normal limits. [R928-29].  Dr. Harper-Hogan noted Plaintiff had a normal range of motion in the bilateral upper and lower extremities but pain to palpitation of the right shoulder, labral region and when performing external rotations of the right shoulder and crossover test.  [R930].  Plaintiff was found to be alert and oriented with a normal affect in speech, no recent or remote memory deficient, did not appear depressed, and had normal grip and pincer grip strength.  [*Id.*].  She further found that Plaintiff's motor strength was essentially 4+/5 or 5/5 for the bilateral upper extremities and 5/5 for the bilateral intrinsics.  [*Id.*].  Plaintiff was noted to ambulate without an assistive device but her gait was unsteady.  [*Id.*].

Dr. Harper-Hogan found mild to moderate limitations in standing, bending, stooping, crouching, sitting, walking, or riding in a car, and mild to moderate manipulative limitations in lifting, reaching, grasping, fingering, pushing, pulling, carrying, or holding items, particularly with the right upper extremity. [R931]. She found that Plaintiff's objective findings supported a permanent significant functional limitation. [*Id*.].

In a Residual Functional Capacity dated April 17, 2017, [7] Antoinette Thaxton-Brooks, M.D., concluded that Plaintiff occasionally lift or carry 20 pounds, frequently lift or carry 10 pounds, stand or walk with normal breaks for four hours, sit with normal break for six hours in an eight-hour day, and had unlimited push/pull limitations other than those noted for lifting and carrying. She occasionally could climb ramps or stairs, never climb ladders, ropes, or scaffolds, occasionally could balance, stoop, kneel, crouch, and crawl. [R81-82].

On May 12, 2017, Plaintiff was given an Adult Behavioral Health Assessment at OGCC Behavioral Health Services ("OGCC"). [R1147]. She was found to have normal speech, to be absent of delusions and visual/auditory hallucinations, to have a calm demeanor, and to have recent and remote memory

---

[7]     Although dated April 17, 2017, Dr. Thaxton-Brooks' report notes that she reviewed Dr. Harper-Hogan's April 18, 2017 evaluation. [R83].

intact.  [*Id.*].

On June 13, 2017, Plaintiff was seen at Wellstar Cobb Hospital with multiple complaints, including dizziness, epigastric pain, and diarrhea.  [R959].  A review of systems was negative for constitutional, cardiovascular, musculoskeletal, and psychiatric/behavioral issues.  [R960].  A physical exam demonstrated that Plaintiff was oriented as to person, place, and time, was not in distress, had a normal range of motion and no edema or tenderness, and her behavior was normal.  [R960-61].

On September 10, 2017, Plaintiff was seen at Wellstar Cobb Hospital complaining of abdominal pain, back pain, and vaginal discharge.  [R989].  A review of systems indicated Plaintiff was negative for chills and fever.  [R990].  A physical exam noted that Plaintiff was oriented to person, place, and time, had a normal range of motion in her neck, her neck was supple, she had a normal musculoskeletal range of motion, she was alert and oriented to person, place, and time, and she had a normal mood and affect.  [R991].

On July 25, 2018, Plaintiff was seen at Wellstar Cobb Hospital complaining of flank and back pain.  [R1030].  A review of systems indicated that Plaintiff was negative for activity change, negative for chest pain, positive for back pain, negative for dizziness, syncope, and speech difficulty, and negative for agitation.

22

[R1032].  A physical exam revealed that Plaintiff was oriented to person, place, and time, had a normal range of musculoskeletal motion, and she was alert and oriented to person, place, and time.  [R1033].

On October 18, 2017, Plaintiff was seen at OGCC and a progress note indicated that her appearance was appropriate, her attitude was cooperative, she was fully oriented, her movement, thought process, and thought content were within normal limits, she denied hallucinations and suicidal thoughts, and her judgment was fair.  [R1159-60].

### D.   Vocational-Expert Testimony

At the hearing before the ALJ, the Vocational-Expert ("VE") identified Plaintiff's past work as including restaurant manager.  [R58].  The VE testified that a hypothetical person of Plaintiff's age, education and work history could not perform her past work if limited to sedentary work but had the option to alternate between sitting and standing once per hour for five to ten minutes without being off task, could never climb ropes, ladders, or scaffolds, could occasionally climb ramps and stairs, stoop, kneel, crouch, balance, and crawl, was limited to frequent pushing, pulling, reaching, fingering, and handling with the right upper extremity, and needed to avoid concentrated exposure to unprotected heights and hazardous machinery.  [R63].  However The VE testified that such an individual could

23

perform other work in the national economy, including bench assembler, order clerk, and surveillance system monitor. [R63-64].

In response to a second hypothetical where the person would be limited to simple and repetitive tasks in a routine work environment but not at production pace or with strictly enforced production quotas, needed to work in a low stress environment making only simple job-related decisions, could interact frequently with coworkers but only occasionally with the public, and due to pain, fatigue, and the side effects of medication, would be off task up to 5% of the day, the VE testified that the individual would not be able to perform any of Plaintiff's past work but would still be able to work as a surveillance system monitor and order clerk. [R64-65].  The VE opined that the hypothetical individual could also find work as a wood product inspector, which was a sedentary, unskilled position with 32,000 jobs in the national economy. [*Id.*].  The VE testified that an individual could be off task for 10% of the workday and still complete the jobs identified in the second hypothetical. [R65-66].

As a third hypothetical, the ALJ asked the VE to consider the second hypothetical again, but added that the individual would be expected to be off task between 10% and 20% of the workday. [R66].  The VE testified that such an

individual would not be able to perform any of Plaintiff's past work and could not sustain competitive employment.  [*Id.*].

## VIII. <u>ALJ'S FINDINGS</u>

The ALJ made the following findings of fact and conclusions of law:

> 1.    The claimant last met the insured status requirement of the Social Security Act through December 31, 2018.
>
> 2.    The claimant has not engaged in substantial gainful activity since February 1, 2013 through the alleged onset date . . . .
>
> 3.    The claimant has the following severe impairments:  depression, anxiety, PTSD, osteoarthritis of the right knee, arthroplasty of the left knee, plantar fasciitis, back pain, and chronic pain syndrome . . . .
>
> . . .
>
> 4.    The claimant does not have an impairment or combination of impairments that meets or medically equaled the severity of one of the listed impairments . . . .
>
> . . .
>
> 5.    After careful consideration of the entire record, [the ALJ found] that the claimant had the residual functional capacity to perform less than the full range of sedentary work . . . except that the claimant has the option to alternate between sitting and standing once per hour for 5-10 minutes without being off task.  The claimant can never climb ropes, ladders, or scaffolds.  The claimant can occasionally climb ramps/stairs, stoop, kneel, crouch, balance, and crawl.  The claimant is limited to frequent pushing, pulling, reaching, fingering, and handling with the right upper extremity.  The claimant must use a cane to ambulate to/from the workstation.  The claimant must avoid concentrated exposure to unprotected heights and hazardous machinery.  The claimant is limited to simple and repetitive tasks in a routine work setting, but not at production pace or with strictly

enforced production quotas, in a low stress work environment, which the [ALJ defined] as having to make only simple job-related decisions. The claimant can interact frequently with co-workers and occasionally with the general public.  Due to pain, fatigue, and side effects of medication, the claimant is off task 5% of the workday.

. . .

6.      The claimant is unable to perform any past relevant work . . . .

. . .

10.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform . . . .

. . .

11.      The claimant has not been under a disability, as defined in the Social Security Act, from February 1, 2013, through the date of this decision . . . .

[R18-29].

The ALJ noted that there was a previous administrative decision dated October 7, 2016 and that, as a result, res judicata applied and the current decision would cover only the period of October 8, 2016 to the date of the decision.  [R16]. The ALJ found that Plaintiff's depression, anxiety, PTSD, osteoarthritis of the right knee, arthroplasty of the left knee, plantar fasciitis, back pain, and chronic pain syndrome significantly caused more than minimal functional limitations in her ability to perform work for at least 12 months and so were severe.  [R19].  The ALJ

26

additionally identified obesity and gastroesophageal esophageal reflux disease ("GERD") as non-severe impairments. [*Id.*].

The ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments and, specifically considered Listings 1.02 and 1.04, and Listings related to mental impairments, including 12.04, 12.06 and 12.15. [R19-20]. The ALJ found that Plaintiff had a mild limitation in understanding, remembering, or applying information, a moderate limitation in concentrating, persisting, or maintaining pace, and a moderate limitation in adapting or managing herself. [R20]. With regard to interacting with others, the ALJ found that Plaintiff had a moderate limitation. [*Id.*]. The ALJ noted that on a function report, Plaintiff reported that she could talk to others in person or on the phone. [*Id.*]. Because Plaintiff's mental impairments did not cause at least two "marked" limitations or one "extreme" limitation, the ALJ found the "paragraph B" criteria were not satisfied. [*Id.*]. The ALJ also found that the "paragraph C" criteria were not satisfied. [*Id.*].

In crafting the RFC, the ALJ considered all symptoms and the extent to which they could reasonably be accepted as consistent with the evidence, and also considered the opinion evidence. [R21]. The ALJ recounted Plaintiff's testimony at the administrative hearing. [R21-23]. The ALJ concluded that Plaintiff's

medically determinable impairments could reasonably be expected to cause the alleged symptoms but her statements regarding the intensity, persistence, and limiting effects of those symptoms was not entirely consistent with the evidence. [R23].

The ALJ noted that on November 2, 2015, Dr. Shau performed a left total knee arthroplasty due to left knee arthritis and at a follow-up appointment Plaintiff complained of pain but had not been doing physical therapy and was taking Percocet.  [*Id.*].  Plaintiff stated she did not want to do physical therapy even after being told of its importance because of the $20 charge.  [*Id.*].  The ALJ recounted that an x-ray of Plaintiff's knees in April 2016 showed no acute abnormality and an MRI of the right shoulder found no advanced tendinosis or significant tear, normal rotator cuff muscle signal intensity and bulk, and biceps tendon normal in signal and course.  [*Id.*].   There was no AC joint arthrosis.  [*Id.*].  The ALJ noted that in a follow-up on August 3, 2016, Plaintiff reported that she was improving overall but complained of right knee pain and wanted to undergo right knee replacement although she had not been doing therapy or exercises.  [*Id.*].  The ALJ noted that Plaintiff was seen on October 27, 2016 at Wellstreet Urgent Care for a sore throat and on a review of systems was negative for back pain and neck pain and upon examination her neck had a normal range of motion and had a normal

mood and affect, judgment, and thought content. [R23-24].

The ALJ also reviewed that on November 21, 2016, Plaintiff was seen by Dr. Morrison with complaints of 8 / 10 right shoulder pain, which was worse when she used her right upper extremity to do her hair, and was assessed following an MRI with right shoulder pain with impingement with intact cuff. [R24]. The ALJ noted that the MRI showed paralabral cyst without labral tear and neck pain and that Dr. Morrison referred Plaintiff to physical therapy and prescribed medication. [*Id.*]. The ALJ noted that on February 6, 2017, Plaintiff was seen at Wellstar Cobb Hospital after someone dropped heavy rotors on her wrist but she was negative for back and neck pain as well as psychiatric/behavioral issues. [*Id.*]. Plaintiff was noted to have a normal gait and normal mood and affect and an x-ray of Plaintiff's right wrist showed only mild degenerative changes. [*Id.*]. The ALJ noted that an x-ray of the cervical spine in March 20, 2017 showed only mild degenerative changes that were most pronounced at C4-5. [*Id.*].

The ALJ pointed out that Plaintiff was seen by Dr. Harper-Hogan on April 16, 2017, for a consultative examination and her neck was found to be supple and her spinal examination revealed no muscle spasms, scaring, or swelling, and was non-scoliotic. [*Id.*]. The ALJ noted that Plaintiff had a full range of motion of the cervical and lumbar spine and a slight tenderness to palpitation, but her gross

29

manipulation skills were within the normal range.  [*Id.*].   Her range of motion for

bilateral upper and lower extremities was normal, pain to palpation was noted on

the right shoulder, and her grip and pincer grip strength was normal bilaterally.

[R24-25].  The ALJ reviewed Dr. Harper-Hogan's opinion that Plaintiff had mild

to moderate postural limitations and manipulative limitations and that the objective

findings supported a significant permanent functional limitation.  [R25].

The ALJ then observed that on June 13, 2017, Plaintiff was seen at Wellstar

Cobb Hospital with multiple complaints and had a normal range of neck motion

and her musculoskeletal examination revealed a normal range of motion and

normal muscle tone.  [*Id.*].  The ALJ noted that Plaintiff was seen in the emergency

department on September 10, 2017 and July 25, 2018 and was noted to be alert and

oriented with a normal range of musculoskeletal motion.  [*Id.*].  A CT of Plaintiff's

lumbar spine on September 11, 2018, found no acute fracture or traumatic

subluxation of the lumbar spine.  [*Id.*].

With regard to Plaintiff's mental impairments, the ALJ noted that Plaintiff

was seen on December 20, 2016 at Grady Hospital and reported that she felt better

being back on medication, that she had a horrible attitude towards others, but that

her depression was not severe.  [R26].  A mental status examination indicated that

Plaintiff was oriented to person, place, and time, her thought process was logical,

and her memory was intact.  [*Id.*].  Plaintiff was assessed with severe recurrent major depressive disorder with psychotic features, mood disorder, and PTSD, was prescribed medication, and Plaintiff was recommended to continue those medications, practice stress management, incorporate healthy lifestyle changes, and attend psychotherapy sessions.  [*Id.*].  The ALJ noted that Plaintiff was seen on May 13, 2017 and October 18, 2017 and was found to be oriented to person, place, situation, and time and denied delusions and/or homicidal or suicidal ideation.  [*Id.*].

The ALJ found that the record indicated that Plaintiff was not as limited as she alleged and was still capable of work.  [*Id.*].  He pointed out that the record showed work activity after October 7, 2016 that indicated Plaintiff's daily activities were greater than she had reported.  [*Id.*].  The ALJ noted no recommendation or suggestion for back or feet surgery.  [*Id.*].  As for Plaintiff's mental impairments, the ALJ found that the evidence showed she was not as limited as alleged and that she consistently had a normal mood and affect, normal judgment and thought content, and her medication was relatively effective in controlling her symptoms.  [R27].  As for the opinion evidence, the Court gave some weight to the state agency medical and psychological consultants because they were consistent with the medical evidence and the proposed RFC limits Plaintiff to sedentary exertion with

31

no more than moderate mental limitations. [*Id.*].  The ALJ also gave some weight to the opinion of Dr. Harper-Hogan because the medical source statement was not wholly consistent with the medical record and Plaintiff's testimony of working seven hours as a part-time delivery driver. [*Id.*].  The ALJ found that the Third-Party Function Report completed by Plaintiff's husband did not establish disability as he was not medically trained and was not a disinterested party. [*Id.*].

The ALJ noted and relied upon the VE's testimony that Plaintiff could not perform her previous work as a restaurant manager. [R27-28].  The ALJ asked the VE whether jobs existed in the national economy for an individual with Plaintiff's age, education, work experience, and RFC, and the VE identified representative occupations such as wood products inspector, with 32,000 jobs annually, order clerk, with 36,000 jobs annually, and surveillance system monitor, with 56,000 annually. [R28].  Based on that testimony, the ALJ found that Plaintiff was capable of making a successful adjustment to other work that exists in significant numbers in the national economy and that a finding of "not disabled" was therefore appropriate. [R29].

## IX.   CLAIMS OF ERROR

Plaintiff argues that she has an impingement and a cyst in her dominant right shoulder that the ALJ failed to evaluate. [Doc. 22 at 14-15].   She argues that she

has consistently reported pain in her right shoulder, an MRI found a lobulated or ganglion cyst in the right shoulder, and her treating orthopedist noted that the cyst was consistent with her bicep and impingement symptoms. [*Id.* at 15]. She contends that injections only helped for a few days and she repeatedly had a reduced range of motion. [*Id.* at 16]. Plaintiff argues this is important because two of the jobs identified by the ALJ require reaching and handling. [*Id.*]. She contends it was not error that the ALJ did not find the impairment severe, but it was error that he failed to consider the limitations it caused because both severe and non-severe impairments must be considered when determining credibility. [*Id.* at 16-17]. She argues that the ALJ must consider a Plaintiff's condition if there is evidence in the record of a diagnosis. [*Id.* at 17].

Second, Plaintiff contends that the ALJ failed to reconcile the RFC with the cyst in her right shoulder and her limited ability to deal with supervisors. [*Id.*]. Plaintiff argues that the ALJ found she could frequently reach, handle, push, and pull and two of the jobs the ALJ identified required frequent reaching and handling, but the ALJ failed to account for her cyst, which her treating orthopedist said was consistent with her symptoms. [*Id.* at 18]. She argues that the ALJ's finding is therefore not supported by substantial evidence. [*Id.*]. She also contends that the ALJ found she had a moderate limitation dealing with others and that she could

interact frequently with coworkers and occasionally with the general public but did not find that she had any limitations in dealing with supervisors. [*Id.* at 19]. She notes that both she and her husband reported she did not deal well with authority figures, the state agency consultants found she had a moderate limitation in accepting instruction from supervisors, and the ALJ failed to explain why he did not include such a limitation. [*Id.*].

Third, Plaintiff argues that the ALJ did not identify or resolve an apparent conflict between the VE testimony and the DOT. [*Id.*]. She contends that the VE identified three occupations in response to the ALJ's second hypothetical, all of which were included in the RFC, and did not indicate additional suitable occupations existed. [*Id.* at 20-21]. Plaintiff argues that the RFC and hypothetical question asked to the VE were limited to simple and repetitive tasks and simple job-related decisions, but this conflicts with two of the jobs identified by the VE (order clerk and surveillance system monitor). [*Id.* 21-22]. Plaintiff argues that the last job, a wood product inspector, cannot carry the ALJ's step-five burden because (1) it requires frequent reaching and handling, (2) the SSA's POMS requires the ALJ to identify three occupations a claimant can perform, (3) the ALJ provided only job numbers as a whole but was required to provide numbers for where she lived or for several regions, (4) the ALJ did not find that 32,000 wood

products inspectors was a significant number and judicial line-drawing is inappropriate because whether a number of jobs is significant requires evaluation on an independent basis.  [*Id.* at 22-23].

In response, the Commissioner argues that the ALJ properly considered Plaintiff's right shoulder impairment and substantial evidence supports the ALJ's RFC finding.  [Doc. 23 at 6].  The Commissioner contends that the ALJ discussed both the normal and abnormal evidence related to Plaintiff's right shoulder impairment, including an April 2016 MRI of the right shoulder, an October 2016 examination where Plaintiff had a normal range of musculoskeletal motion, doctor's notes in November 2016 specifically assessing right shoulder pain with impingement and an MRI showing paralabral cyst without labral tear, and other records.  [*Id.* at 6-8].  She argues that, after considering all of this evidence, the ALJ included several limitation to accommodate Plaintiff's right shoulder impairment, including limiting Plaintiff to frequent pushing, pulling, reaching, fingering, and handling with the right upper extremity.  [*Id.* at 8-9].  The Commissioner contends that it is therefore clear that the ALJ addressed Plaintiff's

right shoulder impairment in crafting the RFC and this Court should not reweigh the evidence.  [*Id.* at 9].

Next, the Commissioner contends that substantial evidence supports the ALJ's RFC finding including no limitation in interacting with supervisors.  [*Id.* at 9-10].  In particular, the ALJ noted, among other things, that Plaintiff did not want to be around people, but also lived with her husband and son, went to the grocery store and church, worked part time, had a normal mood, affect, judgment, and thought content in an examination in October 2016, and at a February 2017 examination she had a normal mood and affect. [*Id.* at 10-11].   The Commissioner argues that substantial evidence therefore supports the RFC finding and this Court should not disturb it.  [*Id.* at 11].

The Commissioner asserts that Plaintiff's argument regarding the state agency consultants is incorrect because Plaintiff points to the Summary Conclusions section of the disability determination form, which does not constitute the RFC assessment and did not need to be considered by the ALJ.  [*Id.* at 11-12]. The Commissioner argues that the ALJ also complied with SSR 96-8p's specificity obligation because he thoroughly discussed the record evidence leading to the RFC, Plaintiff's reports of issues, normal mental status findings of work and daily activities, and the consultants' opinions.  [*Id.* at 13].  The ALJ then included all the

36

limitations supported by the record.  [*Id.* at 13-14].  The Commissioner therefore argues that the ALJ complied with SSR 96-8p.  [*Id.*  at 14].

Finally, the Commissioner argues that the VE's unchallenged testimony about the wood products inspector occupation constitutes substantial evidence to support the ALJ's step-five finding.  [*Id.*].  She contends that the hypothetical posed to the VE incorporated all of the limitations in the RFC and the VE testified that an individual with those limitations could perform the wood products inspector occupation, which had 32,000 jobs in the national economy.  [*Id.* at 15].  She further contends that a significant number of jobs can exist based on one occupation alone and 32,000 is sufficient under Eleventh Circuit precedent.  [*Id.* at 15-17].  As a result, the Commissioner argues that the ALJ need not reach the question of whether the other occupations, order clerk and surveillance system monitor, may be performed with limitations such as simple and repetitive tasks because any error was harmless.  [*Id.* at 17-18].

The Commissioner also argues that Plaintiff's contentions to the contrary should be rejected.  [*Id.* at 18].  First, she argues that Plaintiff only cursorily mentioned that the VE did not identify representative occupations as the ALJ claimed in the decision, so that issue is not before the Court.  [*Id.*].  In any event, the Commissioner argues that the ALJ asked for representative examples and the

VE clearly identified representative occupations.  [*Id.* at 18-19].   Second, the Commissioner argues that substantial evidence supports the ALJ's RFC finding, so Plaintiff's assertion that the wood products inspector position requires frequent reaching and handling is insufficient to carry her burden of demonstrating that she cannot perform the work identified by the ALJ.  [*Id.* at 19].

The Commissioner notes Plaintiff's argument that the ALJ did not comply with the POMS, but contends it lacks merit because one occupation is sufficient to constitute a significant number of jobs and the POMS do not have the force of law.  [*Id.* at 20-21].  The Commissioner also counters Plaintiff's argument that the VE needed to provide numbers for the region she lived in or for several regions, arguing that binding Eleventh Circuit precedent makes clear that the appropriate focus is on the national economy.  [*Id.* at 21-22].  Finally, the Commissioner posits that Plaintiff's argument that the ALJ did not find that 32,000 wood products inspector jobs was a significant number alone and only found that the total amount of jobs, 124,000, was significant.  [*Id.* at 23].  The Commissioner notes that the ALJ never mentioned the total amount of jobs and, in any event, an ALJ decision may be affirmed based on one occupation without remanding a matter back to the ALJ.  [*Id.* at 23-24].  She argues that the number of jobs would still be significant even if

it was reduced by as much as 96% or 99%, making remand unnecessary.  [*Id.* at 24-25].

In reply, Plaintiff argues that the treating orthopedist diagnosed a significant impingement, not an impairment, and that the Commissioner does not dispute that the ALJ did not find any medically determinable impairment in her right shoulder. [Doc. 25 at 1].  She argues that the fact that the ALJ pointed to medical evidence showing a shoulder impairment but did not identify it as an impairment makes it logically inconsistent and requires reversal.  [*Id.* at 1-2].  Plaintiff admits that an ALJ need not discuss all the evidence, but argues that diagnosed impairments must be specifically evaluated.  [*Id.* at 2].  Plaintiff argues that the ALJ did not explain why the RFC requires Plaintiff to reach and handle for six hours a day despite dominant should impairments, which requires reversal.  [*Id.* at 3].

Plaintiff also argues the ALJ's failure to find any impairments in her right shoulder negates the RFC for reaching, handling, pushing, and pulling frequently. [*Id.*].  She contends that, while there were some mild exam findings, an RFC must include only what she can do on a sustained basis and an ALJ must account for evidence tending to show disability.  [*Id.* at 3-4].  She argues that the case must be

reversed because the ALJ did not reconcile the RFC, which included frequent upper extremity activity, with her shoulder diagnoses.  [*Id.* at 4].

Next, with regard to there not being a limitation interacting with supervisors, Plaintiff argues that the Commissioner notes some evidence but most of it does not deal directly with supervisors and seems to indicate that the ALJ should not have found any social functioning limitations.  [*Id.* at 4-5].  She argues that the ALJ must reasonably explain how the RFC accounts for her other findings.  [*Id.* at 5].  She counters the Commissioner's argument that the portions of the state agency opinions upon which she relies because, although they are not binding, an ALJ must still build a logical bridge from the opinions to the RFC.  [*Id.*].  Plaintiff contends that the ALJ's boilerplate assertion that he considered all the evidence is, by itself, insufficient.  [*Id.* at 5-6].

With regard to the conflict between the VE testimony and the DOT, Plaintiff asserts that the Commissioner has not disputed that the ALJ erred by failing to identify and explain conflicts in two of the three identified occupations.  [*Id.* at 6].  She argues the one remaining occupation is insufficient for five reasons.  [*Id.* at 6-7].  First, she contends that the hypothetical question is deficient because the RFC finding was deficient, as she argued above.  [*Id.* at 7].  Second, she argues that the ALJ needed to give deference to POMS, as indicated by binding caselaw.  [*Id.* at

7-8].  She admits that the SSA's interpretation of regulations is not controlling if it is plainly erroneous or inconsistent with the language and purpose of the regulation, but argues that is not the case here and the Commissioner has not argued to the contrary.  [*Id.* at 8-9].  She notes that the Commissioner even relies on another section of the POMS in his argument.  [*Id.* at 9].  She argues that cases finding to the contrary are either not binding, poorly reasoned, likely wrongly decided, and/or distinguishable.  [*Id.* at 9-10].

Plaintiff argues that the Social Security Act requires that jobs exist in significant numbers in the national economy, either in the region where a claimant lives or in several regions of the country.  [*Id.* at 11].  Because there is no such evidence in the record, the Plaintiff argues the ALJ's decision should be reversed. [*Id.* at 11-12].  She contends that the ALJ did not find that 32,000 wood products inspector jobs was a significant number, the ALJ found that 124,000 was a significant number, and this Court is not designated to be factfinder.  [*Id.* at 12-13].  She further argues that, in any event, the ALJ did not clearly articulate that significant numbers of wood product inspector occupations exist.  [*Id.* at 13].

Plaintiff also contends that the VE did not provide representative occupations for persons with all the limitations in the ALJ's RFC.  [*Id.*].  She asserts that the VE identified representative occupations only in response to the ALJ's first

hypothetical question, which contained only some of the limitations in the ALJ's RFC. [*Id*. at 14]. She submits that the Commissioner has not shown that any of the other unspecific occupations it believes were shown by this record actually exist in significant numbers. [*Id*.]. Plaintiff argues that the significant-numbers inquiry is not a legal question reviewed as a matter of statutory interpretation but a fact question reviewed for substantial evidence. [*Id*. at 14-15]. Finally, Plaintiff claims that none of the cases cited by the Commissioner support its arguments. [*Id*. at 15-18].[8]

## X. <u>DISCUSSION</u>

After careful consideration of the parties' arguments, the ALJ's decision, and the evidence of record, the undersigned concludes that the ALJ's decision is not supported by substantial evidence and was based upon errors of law. *Doughty*, 245 F.3d at 1278 n.2; *Boyd*, 704 F.2d at 1209.

Plaintiff first argues that she has an impairment in her dominant right shoulder that the ALJ failed to evaluate. [Doc. 22 at 14-15]. A review of the ALJ's

─────────────────

[8]     Although reply briefs are generally limited to 15 pages under the Local Rules, *see* LR 7.1(D), NDGa, the Court granted Plaintiff's motion for three additional pages on November 18, 2020. [*See* Doc. 24]. The Court notes that two and a half of the pages granted are single spaced and in a "bullet" format, however. [*See* Doc. 25 at 15-18]. Counsel is reminded that briefing is to be presented in a double-spaced format. LR 5.1(C)(2), NDGa.

decision shows that the ALJ did not find any impairment in Plaintiff's right shoulder, either severe or non-severe.  [R19].  Nonetheless, there is evidence in the record of a paralabral cyst at the posterior superior glenoid at level of spinoglenoid notch that caused Plaintiff pain and limited her right shoulder range of motion. [R370, 937, 939-40, 946, 948].

Nonetheless, not every diagnosis is an impairment.  *Wind v. Barnhart*, 133 Fed. Appx. 684, 690 (11th Cir. June 2, 2005) (stating "a diagnosis or a mere showing of 'a deviation from purely medical standards of bodily perfection or normality' is insufficient; instead, the claimant must show the effect of the impairment on her ability to work") (quoting *McCruter v. Bowen*, 791 F.2d 1544, 1547 (11th Cir. 1986)).  Because of that fact, the ALJ conducts a "severity" test at step-two to screen out groundless claims.  *Stratton v. Bowen*, 827 F.2d 1447, 1452 (11th Cir. 1987).  In addition, if an impairment exists, it can only be considered "not severe" if it is a slight abnormality that has a minimal effect on the individual and would not interfere with the individual's ability to work, *Bridges v. Bowen*, 815 F.2d 622, 625 (11th Cir. 1987).  A severe impairment, on the other hand, is one that significantly limits a claimant's abilities to do basic work activities.  *See* 20 C.F.R. § 404.1520(c).

For purposes of the step-two analysis, however, "the finding of any severe

impairment, whether or not it qualifies as a disability and whether or not it results from a single severe impairment or a combination of impairments that together qualify as severe, is enough to satisfy the requirement of step two." *Jamison v. Bowen*, 814 F.2d 585, 588 (11th Cir. 1987).   This is because, once the ALJ proceeds beyond step two, he must consider the claimant's entire medical condition. *Burgin v. Comm'r of Soc. Sec.*, 420 Fed. Appx. 901, 902 (11th Cir. Mar. 30, 2011) (per curiam); *see also* 20 C.F.R. § 416.945(a)(2) (providing that the Commissioner considers all of the claimant's impairments when determining the claimant's RFC). Thus, if the ALJ considered Plaintiff's impairment in step four, the omission of the impairment from the step-two recitation would not warrant reversal.

The ALJ in this matter did not explicitly discuss an impairment related to Plaintiff's impingement and cyst in her right shoulder in step four, [R21-27], but did review evidence of the impingement and cyst themselves, and included a limitation specifically directed to Plaintiff's right shoulder.  For example, the ALJ noted Plaintiff's testimony that her daughter did her hair a lot because she was unable to lift her arms without pain.  [R22, 56].  The ALJ recounted that an April 21, 2016 MRI of Plaintiff's right shoulder found no advanced tendinosis or significant tear, normal rotator cuff muscle signal intensity and bulk, and biceps tendon normal in signal and course, no advance AJC joint arthrosis, no significant subacromial

subdeltoid bursitis, and no evidence of internal derangement in the shoulder.  [R23, 370].  The ALJ specifically noted that the impression of a paralabral cyst at the posterior superior glenoid at level of spinoglenoid notch without a discrete identifiable displaced labral tear.  [R23, 370].

The ALJ further described that Plaintiff was seen by Dr. Morrison on November 21, 2016 complaining of right shoulder pain, was assessed with right shoulder pain with impingement, that an MRI showed a paralabral cyst, and that Dr. Morrison referred Plaintiff to physical therapy and prescribed medication.  [R24, 942-43].   The ALJ noted Dr. Harper-Hogan's finding that Plaintiff experienced pain to palpation of the right shoulder, labral region.  [R24-25, 929-31].  Based on these findings, the ALJ limited Plaintiff to frequent pushing, pulling, reaching, fingering, and handling with the right upper extremity.  [R21].

Giving these facts, the Court finds that, even if the ALJ committed error by not identifying Plaintiff's shoulder issues as an impairment, the ALJ properly considered evidence related to that impairment and included relevant limitations in the RFC.   Accordingly,  any  error  was  harmless.   *See Walker v. Bowen*, 826 F.2d 996, 1002 (11th Cir. 1987) (applying harmless error analysis in Social Security case); *Diorio v. Heckler*, 721 F.2d 726, 728 (11th Cir. 1983) (applying harmless error analysis where the ALJ made an incorrect statement of fact); *Young*

*v. Astrue*, No. 8:09-cv-1056, 2010 WL 4340815, *4 (M.D. Fla. Sept. 29, 2010) (stating that an error is generally harmless in a Social Security case if it "do[es] not affect the ALJ's determination that a claimant is not entitled to benefits").

The Court further notes that Plaintiff does not point to any evidence showing that her shoulder impairment caused greater restriction on her ability to work than the limitations reflected in the RFC.[9]  *See Moore v. Barnhart*, 405 F.3d 1208, 1213 n.6 (11th Cir. 2005) (stating that "the mere existence of . . . impairments does not reveal the extent to which they limit her ability to work or undermine the ALJ's determination").  There is no need to remand for express findings when doing so would be a "wasteful corrective exercise"' in light of the evidence of record. *Sanchez v. Comm'r of Soc. Sec.*, 507 Fed. Appx. 855, 856 (11th Cir. Feb. 8, 2013) (per curiam) (quoting *Ware v. Schweiker*, 651 F.2d 408, 412-13 (5th Cir. Unit A

---

[9]     The Court notes that Plaintiff does argue that two of the three positions identified by the ALJ require reaching and handling. [Doc. 22 at 16]. However, Plaintiff does not point to evidence demonstrating that he could not perform these positions with the limitations in the RFC imposed by the ALJ. In any event, even if Plaintiff could point to such evidence, it would be insufficient if the ALJ's decision as itself supported by substantial evidence. *See*, *e.g.*, *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir.2005) ("If the Commissioner's decision is supported by substantial evidence, this court must affirm, even if the proof preponderates against it").

July 24, 1981)[10]).

Plaintiff argues that the ALJ erred by failing to evaluate the impingement and a cyst in her dominant right shoulder, regardless of whether they were considered severe or non-severe impairments, [Doc. 22 at 16-17], but as explained above, the ALJ did review the relevant medical record and crafted an RFC accounting for Plaintiff's condition. Plaintiff additionally argues that the fact that the ALJ pointed to medical evidence showing a shoulder impairment but did not identify it is an impairment makes it logically inconsistent, [Doc. 25 at 1-2], but the Court has found that any inconsistency was harmless error.

In her second claim of error, Plaintiff argues that the RFC failed to reconcile the RFC with the cyst in her right shoulder and her limited ability to deal with authority figures. [Doc. 22 at 17]. The Court finds Plaintiff's argument with regard

_____

[10]     **Error! Main Document Only.**In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent decisions of the Fifth Circuit, including Unit A panel decisions of that circuit, handed down prior to October 1, 1981. *See United States v. Todd*, 108 F.3d 1329, 1333 n.5 (11th Cir. 1997); *Limelight Productions, Inc., v. Limelite Studios, Inc.*, 60 F.3d 767, 769 n.1 (11th Cir. 1995).

to the cyst in her right shoulder not being evaluated in the RFC unpersuasive for the reasons stated above.

With regard to her limited ability to deal with supervisors, the Court notes that the RFC limited Plaintiff to frequent interactions with coworkers and occasional interactions with the general public.  [R21].  The RFC does not include any limitation in Plaintiff's interaction with supervisors and does not explain why a limitation was imposed for coworkers and the public but not for supervisors.  [*Id.*].  In the section of the opinion discussing Plaintiff's ability to interact with others, the ALJ found a moderate limitation and noted only that Plaintiff reported that she was able to talk with others in person, use a phone, and use a computer.  [R20].

The Court notes that the state agency consultants found that Plaintiff had a moderate limitation in her ability to interact appropriately with the public and in accepting instructions and responding appropriately to criticism from supervisors, but was not significantly limited in her ability to get along with coworkers.  [R84-85, 124-26].  Notably, the ALJ gave these opinions some weight because, among other reasons, they imposed no more than moderate limitations.  [R27].  The Court also observes that in the function reports, both Plaintiff and her husband indicated that Plaintiff did not get along with authority figures at all.  [R274-75, 285].  While the ALJ discounted the Third-Party Function Report submitted by

48

Plaintiff's husband, [R27], the ALJ cited repeatedly to Plaintiff's Function Report in the opinion.  For example, in determining Plaintiff's ability to adapt or manage herself, the ALJ noted that Plaintiff asserted that she could take care of her son and husband and had no problem feeding herself, bathing, or using the toilet.  [R20]. In determining Plaintiff's ability to understand, remember, or apply information, the ALJ referred to Plaintiff's function report and noted that she had not reported any problems with understanding, memory, or following instructions.  [*Id.*].

The Commissioner argues that Plaintiff stated she did not want to be around people but also admitted that she lived with her husband and son, went to the grocery store and church, and worked part time.  [Doc. 23 at 9-11].  The Court finds that these facts do not bear directly on Plaintiff's ability to work full-time with a supervisor.  The Commissioner further argues that Plaintiff had a normal mood, affect, judgment, and thought content in an examination in October 2016, and at a February 2017 examination she had a normal mood an affect, and points to other relatively normal findings.  [*Id.*].  These findings similarly do not directly address the issue of Plaintiff's ability to interact with supervisors, or accept criticism from them, on a full-time basis.

The Commissioner further argues that Plaintiff's reliance upon the state agency consultants' narrative summary conclusions that Plaintiff had moderate

limitations in accepting instructions and responding appropriately to supervisors, [Doc. 23 at 11-12; R85, 126], does not compel reversal. The Commissioner contends that the ratings are " 'merely a worksheet to aid in deciding the presence and degree of functional limitations and the adequacy of documentation and does not constitute the RFC assessment.' " [Doc. 23 at 12 (quoting Programs Operations Manual System (POMS) DI § 24510.060(B)(2)(a), (4)) (emphasis deleted); and citing *Land v. Comm'r of Soc. Sec.*, 494 Fed. Appx. 47, 49 (11th Cir. Oct. 26, 2012) (explaining the POMS summary conclusion ratings are not RFC assessment))].[11]

The Commissioner does not deny, however, that the ALJ afforded weight to the findings of the state agency consultants, [R27], and imposed limitations on Plaintiff's ability to interact with the public and coworkers. [R21]. Therefore, the Commissioner's argument does not clarify why the ALJ imposed some restrictions on Plaintiff in some areas consistent with these consultants' conclusions and not in others, especially given Plaintiff's own asserted limitation in interacting with supervisors. Accordingly, the Court concludes that the ALJ has not built a logical bridge from the evidence to his conclusions. *Flentroy-Tennant v. Astrue*, No. 3:07-

---

[11]   The Court notes, however, that the Commissioner argues elsewhere in his brief the POMS are not binding. [Doc. 23 at 20]; *see also Stroup v. Barnhart*, 327 F.3d 1258, 1262 (11th Cir. 2003); *Johnson v. Sullivan* , 735 F. Supp. 416, 422 n.5 (M.D. Fla. 1990).

cv-101-J-TEM, 2008 WL 876961, at *8 (M.D. Fla. Mar. 27, 2008) ("An ALJ is required to build an accurate and logical bridge from the evidence to his or her conclusion") (quoting *Baker v. Barnhart*, No. 03-C-2291, 2004 WL 2032316, at *8 (N.D. Ill. Sept. 9, 2004)); *see also Blakes ex rel. Wolfe v. Barnhart*, 331 F.3d 565, 569 (7th Cir. 2003) ("We require the ALJ to build an accurate and logical bridge from the evidence to her conclusions so that we may afford the claimant meaningful review of the SSA's ultimate findings").

The Court also concludes that this error was not harmless. *Walker*, 826 F.2d at 1002; *Diorio*, 721 F.2d at 728; *Young*, 2010 WL 4340815, *4. There is no indication in the record or testimony from the VE indicating that Plaintiff would not have interaction with supervisors in the three representative jobs identified and/or would not receive criticism directly from those supervisors. [*See* R28 (identifying wood products inspector, order clerk, and surveillance system monitor); *see generally* R16-29, 58-66]. On this record, it is unclear whether the identified positions are suitable for Plaintiff, and the Court declines to assume that, if ALJ had discussed whether a limitation was necessary, the ALJ would have concluded that Plaintiff could still work in these positions.[12]

---

[12]    Plaintiff also requests that the Court order the Commissioner to change her date last insured from December 31, 2018 to March 31, 2020.

In conclusion, the Court **REVERSES** the final decision of the Commissioner **AND REMANDS** the case to the Commissioner for further proceedings consistent with this Order and Opinion.[13]

The Clerk is **DIRECTED** to enter final judgment in favor of Plaintiff.

**IT IS SO ORDERED and DIRECTED**, this 13th day of September, 2021.

_____
**ALAN J. BAVERMAN**
**UNITED STATES MAGISTRATE JUDGE**

_____

[Doc. 22 at 24]. However, it does not appear that this issue was raised before the Commissioner and the Court elects not to address it in the first instance here. The Court expects the ALJ will address this issue on remand.

[13]    Plaintiff also filed a notice of supplemental authority that cites *Collins v. Yellen*, 141 S. Ct. 1761 (2021), and *Seila Law, LLC v. Consumer Financial Protection Bureau*, 140 S. Ct. 2183 (2020), and attaches a July 8, 2021 Memorandum Opinion for the Deputy Counsel to the President that purports to assert that the President may remove the Commissioner of Social Security. [Doc. 29]. The Court will not consider this supplemental authority, since Plaintiff makes no showing how either case or the memorandum opinion supports her claim that the Commissioner's decision on her disability claim was incorrect. *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014) (stating a party fails to adequately brief an issue when she raises it in a perfunctory manner, without supporting arguments and authority); *see also Bailey v. Soc. Sec. Admin., Comm'r*, 791 Fed. Appx. 136, 137 n.1 (11th Cir. Nov. 6, 2019) (declining to address one of the plaintiff's arguments because she raised it "in a perfunctory manner without supporting arguments").